**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

             -against-

JAMES PEDROSO,

             Defendant.

Case No. 17-CR-325 (ILG)

**DEFENDANT JAMES PEDROSO'S SUPPLEMENTAL**
**MEMORANDUM OF LAW IN SUPPORT OF HIS**
**MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)**

PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
Justin D. Lerer
Daniel S. Sinnreich
Daniel A. Negless
Alexander F. Atkins

*Counsel for Defendant James Pedroso*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ..........................................................................................3

ARGUMENT ...............................................................................................................6

I.      Mr. Pedroso Has Exhausted His Administrative Remedies.................................6

II.     Extraordinary and Compelling Reasons Warrant Granting Compassionate Release
        to Mr. Pedroso.......................................................................................................7

        A.      This Court May Find "Extraordinary and Compelling" Reasons for
                Compassionate Release Other Than Those Expressly Identified in
                U.S.S.G. § 1B1.13.......................................................................................8

        B.      COVID-19 Presents an "Extraordinary and Compelling" Reason to
                Reduce Mr. Pedroso's Sentence .................................................................9

        C.      Numerous Courts in this District and Elsewhere Have Granted
                Compassionate Release for Medically Vulnerable Inmates at High Risk
                for COVID-19, Including Numerous Inmates at FCI Cumberland .....................19

III.    The 18 U.S.C. § 3553(A) Sentencing Factors Warrant Reducing Mr. Pedroso's
        Sentence to Time Served or Modifying His Judgment to Allow Serving the
        Remainder of His Sentence on Home Confinement ........................................21

CONCLUSION.........................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Pepper* v. *United States*,
  562 U.S. 476, 490–93 (2011) ................................................................................21

*United States* v. *Asaro*,
  No. 17-CR-127 (ARR), 2020 WL 1899221 (E.D.N.Y. Apr. 17, 2020) .............................8, 19

*United States* v. *Canini*,
  No. 4-CR-283 (PAC), Dkt. No. 337 (S.D.N.Y. June 8, 2020) ...................................... passim

*United States* v. *Chappell*,
  No. 10-CR-6085 (DGL), Dkt. No. 79 (W.D.N.Y. June 19, 2020) ...................................20, 21

*United States* v. *Copeland*,
  No. 2-CR-1120 (FB), 2020 WL 2537250 (E.D.N.Y. May 19, 2020) ............................8, 9, 19

*United States* v. *Field*,
  No. 18-CR-426, Dkt. No. 38 (S.D.N.Y. May 4, 2020) ............................................................6

*United States* v. *Gakhal*,
  No. 15-CR-470 (JHL), 2020 WL 3529904 (N.D. Ill. June 30, 2020) ....................................20

*United States* v. *Gutman*,
  No. 19-CR-69 (RDB), 2020 WL 2467435 (D. Md. May 13, 2020) ................................13, 20

*United States* v. *Haney*,
  No. 19 CR-541 (JSR), 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) .....................................6

*United States* v. *Hansen*,
  No. 7-CR-520 (KAM), 2020 WL 1703672 (E.D.N.Y. Apr. 8, 2020) ....................8, 19, 20, 24

*United States* v. *Harris*,
  No. 18-CR-364 (PGG), Dkt. No. 414 (S.D.N.Y. Apr. 8, 2020) .............................................17

*United States* v. *Haynes*,
  No. 93-CR-1043 (RJD), 2020 WL 1941478 (E.D.N.Y. Apr. 22, 2020)................................8, 9

*United States* v. *Henao*,
  No. 10-CR-213 (ENV), 2020 WL 1812447 (E.D.N.Y. Apr. 9, 2020)...................8, 16, 19, 22

*United States* v. *Hernandez*,
  No. 18-CR-834-04 (PAE), 2020 WL 1684062 (S.D.N.Y. Apr. 2, 2020) .........................16, 17

*United States* v. *Kissi*,
  No. 13-CR-51 (MKB), 2020 WL 3723055 (E.D.N.Y. June 26, 2020)....................7, 8, 18, 24

*United States* v. *Mapp*,
  No. 95-CR-1162 (FB), 2020 WL 3410344 (E.D.N.Y. June 19, 2020)...............................8, 18

*United States* v. *Marin*,
  No. 15-CR-252 (PKC), Dkt. No. 1325 (E.D.N.Y. Mar. 30, 2020) ..................................8, 20

*United States* v. *Moskowitz*,
  No. 11-CR-793 (WFK), Dkt. No. 203 (E.D.N.Y. Apr. 30, 2020) ......................................8, 19

*United States* v. *Park*,
  No. 16-CR-473 (RA), 2020 WL 1970603 (S.D.N.Y. Apr. 24, 2020) ....................................17

*United States* v. *Sawicz*,
  No. 8-CR-287 (ARR), 2020 WL 1815851 (E.D.N.Y. Apr. 10, 2020).....................7, 8, 19, 22

*United States* v. *Sedge*,
  No. 16-CR-537(KAM), 2020 WL 2475071 (E.D.N.Y. May 13, 2020) ...........................8, 19

*United States* v. *Smith*,
  No. 12-CR-133 (JFK), 2020 WL 1849748 (S.D.N.Y. Apr. 13, 2020) ...................................17

## STATUTES

18 U.S.C. § 3553(a) ...............................................................................................1, 2, 21, 22

18 U.S.C. § 3582(c)(1)(A) .................................................................................................. passim

21 U.S.C. § 841(b)(1)(C) .............................................................................................................3

28 U.S.C. § 994(t) ........................................................................................................................8

First Step Act of 2018 ..................................................................................................................8

U.S.S.G. § 1B1.13...........................................................................................................................8

James Pedroso, by and through his undersigned counsel, Paul, Weiss, Rifkind, Wharton & Garrison LLP, respectfully requests that the Court grant him compassionate release from the custody of the United States Bureau of Prisons (the "BOP") pursuant to 18 U.S.C. § 3582(c)(1)(A) on the "extraordinary and compelling" grounds that Mr. Pedroso is at serious risk of grave illness or death as a result of the COVID-19 pandemic and will remain at such grave risk if he is forced to serve the remainder of his sentence at a BOP facility. Accordingly, Mr. Pedroso respectfully requests an order reducing his sentence to time served or, in the alternative, modifying his sentence to permit immediate home confinement.

## PRELIMINARY STATEMENT

There is a substantial chance that Mr. Pedroso will become gravely ill or die if the Court does not grant him compassionate release. Mr. Pedroso suffers from chronic asthma which places him at risk of severe illness or death from COVID-19. Mr. Pedroso's medical vulnerability to COVID-19 and his inability to take self-care measures while incarcerated at FCI Cumberland constitute extraordinary and compelling reasons for granting compassionate release.

Three factors guide a court's discretion in assessing a motion for compassionate release: (1) whether the defendant has exhausted his administrative rights to seek relief from the BOP; (2) whether there are "extraordinary and compelling reasons" for the release; and (3) the relevant sentencing factors under 18 U.S.C. § 3553(a). 18 U.S.C. § 3582(c)(1)(A).

Each factor weighs in favor of granting Mr. Pedroso compassionate release.

*First*, the exhaustion requirement is met because more than 30 days have elapsed since Mr. Pedroso's request for compassionate release was submitted to the Warden of his facility. Additionally, nearly two months have elapsed since Mr. Pedroso appealed the Warden's denial of his request.

*Second*, as more than 350 courts have recently found, including 11 courts in this District, the COVID-19 pandemic constitutes an extraordinary and compelling reason to grant compassionate release.  The COVID-19 pandemic requires people to take numerous safety precautions, such as social distancing and use of personal protective equipment, which are impossible for incarcerated individuals.  Continued incarceration at FCI Cumberland threatens Mr. Pedroso's life, as the facility has already experienced cases of COVID-19, and Mr. Pedroso's chronic asthma places him at grave risk if he contracts the disease.  Notably, another district court recently granted a motion for compassionate release for another inmate at the same facility who similarly suffers from respiratory complications.  *See United States* v. *Canini*, No. 4-CR-283, Dkt. No. 337 (S.D.N.Y. June 8, 2020).

*Finally*, the Section 3553(a) factors militate in favor of reducing Mr. Pedroso's sentence or converting the remainder of his sentence to home confinement.  Mr. Pedroso's single count of conviction was a non-violent offense, and he poses no danger to society.  Mr. Pedroso has served the vast majority of his sentence and is scheduled to be released to a halfway house in December.  Mr. Pedroso has been a model inmate.  He has earned his GED and other vocational certificates, stayed sober and participated in drug counseling programs, and has only one disciplinary citation from nearly three years ago.  And Mr. Pedroso has developed a robust release plan, including a safe and supportive home, a firm offer of employment, and unconditional support from his friends and family, all of which will ensure a safe transition to the community, where he can protect himself from the spread of COVID-19.

We respectfully ask the Court to consider this motion on an expedited basis as each day in custody imposes a potentially lethal risk to Mr. Pedroso.

## STATEMENT OF FACTS

On June 23, 2017, Mr. Pedroso pleaded guilty to one count of violating the

federal narcotics laws, 21 U.S.C. § 841(b)(1)(C).  The Court sentenced Mr. Pedroso on January

11, 2018 to 48 months' imprisonment.  At the time Mr. Pedroso's federal sentence was imposed,

he had already served 11 months of a 31-month state sentence for a related probation violation.[1]

Mr. Pedroso is currently incarcerated at FCI Cumberland in Maryland.  He has

served 31 months of his federal term.  His expected release date, as calculated by the BOP, is

June 6, 2021.  He is scheduled to report to the Brooklyn House Residential Reentry Center on

December 9, 2020.  (Ex. 1.)[2]

On June 1, 2020, Mr. Pedroso's girlfriend, Meredith Trainor, filed a request with

Warden Bell at FCI Cumberland seeking compassionate release for Mr. Pedroso due to the high

risks presented by his chronic asthma and the pandemic.  (Ex. 2.)  On June 23, 2020, Ms. Trainor

received a letter response from Warden Bell denying the request for compassionate release.

(Ex. 3.)  On June 25, 2020, Mr. Pedroso appealed the Warden's decision by filing a Regional

Administrative Remedy Appeal.  (Ex. 4.)  On June 15, 2020, Mr. Pedroso filed a pro se motion

for compassionate release with this Court.  (Dkt. No. 36.)  Mr. Pedroso subsequently retained the

undersigned counsel for assistance with his motion.

Mr. Pedroso suffers from chronic asthma, which puts him at greater risk of

contracting COVID-19 and experiencing severe illness or death if he catches the disease.  Mr.

Pedroso has suffered from asthma since childhood and has been hospitalized and intubated for

---

[1]    At the time of Mr. Pedroso's sentencing, the government did not object to giving Mr. Pedroso an 11-month credit for time he had already served on his state sentence.  (Sentencing Memorandum from United States, Dkt. No. 31 at 4, n.5.)  Although Mr. Pedroso did not receive such a credit, the Court ordered that his federal sentence should run concurrently with the unserved portion of his state sentence.  (Judgment, Dkt. No. 33 at 2.)

[2]    References to "Ex. __" refer to exhibits attached to the accompanying Declaration of Daniel A. Negless.

severe asthma attacks on multiple occasions.  (Letter from James Pedroso to Court ("J. Pedroso

Ltr.") ¶ 4; Joint Declaration from Lorraine Pedroso and James Pedroso Sr. ("L. and J. Pedroso

Sr. Joint Decl.") ¶¶ 2–4; Declaration from Caitlin Pedroso ("C. Pedroso Decl.") ¶¶ 2–3.)[3]  Mr.

Pedroso has also been prescribed a variety of medications to manage his symptoms, including

Advair, Singulair, and albuterol inhalers and nebulizers.  (J. Pedroso Ltr. ¶ 4; L. and J. Pedroso

Sr. Joint Decl. ¶ 3; *see also* Ex. 8, J. Pedroso Medical Records from Dr. Adam D. Zeitlin

(diagnosing James with chronic obstructive asthma and providing asthma prescriptions for

eleven medical visits between December 2013 and February 2017).)  During his incarceration at

FCI Cumberland, Mr. Pedroso has repeatedly been assessed as asthmatic, has been regularly

prescribed albuterol inhalers, and has received clinical medical treatment for breathing issues on

five occasions since April 2019.  (Ex. 9 at 4–8, 36–41, 46–46.)  Mr. Pedroso continues to suffer

uncontrolled asthma attacks on a weekly basis that require him to use his inhaler to manage his

symptoms, including as recently as August 19, 2020.  (J. Pedroso Ltr. ¶ 5.)  According to the

U.S. Centers for Disease Control and Prevention ("CDC"), individuals like Mr. Pedroso whose

medical conditions give them trouble breathing—particularly asthmatics—are at a significantly

higher risk of experiencing severe complications or death from COVID-19.[4]

---

[3]    These letters and declarations are attached as Exhibits 5, 6, and 7, respectively, to the accompanying
Declaration of Daniel A. Negless.  As indicated in the Negless Declaration, the letter attached as Exhibit 5 is a
true and correct copy of a verbatim transcription of a letter from James Pedroso in support of his motion for
compassionate release.  This letter was dictated by James Pedroso to his counsel during a legal phone call held
on August 19, 2020.  We understand that Mr. Pedroso handwrote a substantially similar letter to the Court
several weeks ago, but due to unanticipated delays in the delivery of prisoner postal mail, we have not received
Mr. Pedroso's handwritten letter and cannot file it with the Court.

[4]    *See, e.g.*, Ex. 10, CDC, *People With Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-
ncov/need-extra-precautions/people-with-medical-conditions.html (Aug. 14, 2020); Ex. 11, CDC, *Coronavirus
Disease 2019, Key Updates for Week 31, ending August 1, 2020*, https://www.cdc.gov/coronavirus/2019-
ncov/covid-data/covidview/index.html  (Aug. 14, 2020); Ex. 12, CDC, *National Center for Health Statistics –
Asthma*, https://www.cdc.gov/nchs/fastats/asthma.htm (Feb. 21, 2020).

Notwithstanding his serious medical condition, Mr. Pedroso has demonstrated a commitment to personal growth and self-improvement during his term of imprisonment.  Mr. Pedroso earned his General Equivalency Diploma ("GED") in December 2018.  (Ex. 13.)  He has also earned certificates in dry walling from Allegany College (Ex. 14), completed a stress management course, and regularly attended Narcotics Anonymous substance abuse counseling.  Mr. Pedroso also meditates regularly and has read numerous self-help books, including *Resilience: Hard-Won Wisdom for Living a Better Life* and *Unbeatable Mind: Forge Resiliency and Mental Toughness to Succeed at an Elite Level*.  (J. Pedroso Ltr. ¶ 10.)  Finally, Mr. Pedroso volunteers as a health aide to his 83-year-old cellmate, assisting him with daily activities and attending to his basic health needs.  (J. Pedroso Ltr. ¶ 9.)

Mr. Pedroso is in close contact with his loved ones and has an expansive support network to assist him with his transition out of BOP custody.  Mr. Pedroso speaks with his girlfriend, Ms. Trainor, multiple times a day, and is in contact with his mother and sister nearly every day.  (J. Pedroso Ltr. ¶ 11; Ex. 15, Declaration of Meredith Trainor ("M. Trainor Decl.") ¶ 8.)  Ms. Trainor and Mr. Pedroso's entire family, including his mother, father, sister, and 12-year-old niece, have also visited him in prison.  (L. and J. Pedroso Sr. Joint Decl. ¶ 8; M. Trainor Decl. ¶ 9.)  Ms. Trainor and Mr. Pedroso's parents and sister have each submitted declarations explaining their relationships with Mr. Pedroso and expressing their concern for his incarceration during the pandemic and wholehearted support for Mr. Pedroso's release.  (L. and J. Pedroso Sr. Joint Decl. ¶¶ 5, 18; M. Trainor Decl. ¶¶ 3, 5–6; C. Pedroso Decl. ¶ 10.)

When Mr. Pedroso is released from BOP custody, he plans to live with Ms. Trainor on the Upper East Side of Manhattan.  He will be a short subway ride from his family home in Queens, where he also has a bed should he ever need it.  Ms. Trainor is eager to support

Mr. Pedroso's transition back into society, which she is particularly well qualified to do because of her experience and training as a social worker, first on Rikers Island and more recently at The Legal Aid Society.  (M. Trainor Decl. ¶ 2.)  Ms. Trainor has already reached out to the Community Reentry and Assistance Network, which is aware of Mr. Pedroso's pending release and has confirmed his eligibility for numerous services, including assistance acquiring medications; obtaining mental health, medical, and substance-abuse referrals; and obtaining educational, vocational, and entitlements assistance.  (Ex. 16.)  Finally, Mr. Pedroso has a firm offer of employment upon his release from his father's employer, a concrete contracting company called Prime Ready Mix.  (Ex. 17.)

## **ARGUMENT**

### I.  **Mr. Pedroso Has Exhausted His Administrative Remedies**

Courts may consider compassionate release motions filed by a defendant (i) when "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or (ii) after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"  18 U.S.C. § 3582(c)(1)(A); *see, e.g.*, *United States* v. *Haney*, No. 19 CR-541 (JSR), 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020) ("[Section 3582(c)(1)(A)] requires the defendant either to exhaust administrative remedies or simply to wait [30] days after serving his petition on the warden of his facility before filing a motion in court.").

In this case, the Court has clear authority to reduce Mr. Pedroso's sentence.

*First*, more than 30 days have elapsed since Mr. Pedroso's request for compassionate release was submitted to Warden J.R. Bell of FCI Cumberland on June 1, 2020.[5]

---

[5]     *See* Ex. 19, Fed. Bureau of Prisons, Program Statement No. 5050.50, *Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)*, §571.63 Denial of request (Jan.

(Ex. 2.)  The fact that Warden Bell subsequently denied the request (Ex. 3 at 1), has no effect on the 30-day clock.  *Haney*, 2020 WL 1821988, at *3; *see* Ex. 18, *United States* v. *Field*, No. 18-CR-426, Dkt. No. 38 (S.D.N.Y. May 4, 2020) (deeming claim ripe for judicial review as of 30 days after defendant submitted request to warden, where warden denied the claim within the 30-day period).  Accordingly, this Court may consider Mr. Pedroso's motion.

> *Second*, Mr. Pedroso has exhausted his administrative remedies because, on June 25, 2020, he appealed Warden Bell's denial of compassionate release.  (Ex. 4.)  "A prisoner exhausts his administrative rights when the BOP fails to bring a motion for compassionate release on his behalf and he exercises all administrative rights to appeal."  *United States* v. *Sawicz*, No. 08-CR-287 (ARR), 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020).

> Moreover, even if Mr. Pedroso has not exhausted his administrative remedies, this Court should nonetheless waive the exhaustion requirement.  *See, e.g.*, *United States* v. *Kissi*, No. 13-CR-51 (MKB), 2020 WL 3723055, at *9 (E.D.N.Y. June 26, 2020) ("The Court finds that, in the context of an unprecedented public health crisis, [Defendant's] designation by BOP as particularly vulnerable should he contract COVID-19, the particular risks the virus poses to him . . . and the fact that it may take months for him to fully exhaust his claim, present extraordinary circumstances warranting waiver of the exhaustion requirement.").

## II.    Extraordinary and Compelling Reasons Warrant Granting Compassionate Release to Mr. Pedroso

> A court may reduce a defendant's sentence when "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i).  Numerous courts in this district have recently granted motions for compassionate release after concluding that the grave

---

17, 2019), https://www.bop.gov/policy/progstat/5050_050_EN.pdf ("Under 18 USC 3582 (c) (1), an inmate may file a request for a reduction in sentence with the sentencing court after . . . the lapse of 30 days from the receipt of such a request by the Warden of the inmate's facility.").

threat posed by the COVID-19 pandemic to high-risk individuals with underlying medical conditions constituted an "extraordinary and compelling reason."  *See, e.g.*, *Kissi*, 2020 WL 3723055; *United States* v. *Mapp*, No. 95-CR-01162 (FB), 2020 WL 3410344 (E.D.N.Y. June 19, 2020); *United States* v. *Copeland*, No. 02-CR-01120 (FB), 2020 WL 2537250 (E.D.N.Y. May 19, 2020); *United States* v. *Sedge*, No. 16-CR-537 (KAM), 2020 WL 2475071 (E.D.N.Y. May 13, 2020); *United States* v. *Moskowitz*, No. 11-CR-793 (WFK), Dkt. No. 203 (E.D.N.Y. Apr. 30, 2020); *United States* v. *Haynes*, No. 93-CR-1043 (RJD), 2020 WL 1941478 (E.D.N.Y. Apr. 22, 2020); *United States* v. *Asaro*, No. 17-CR-127 (ARR), 2020 WL 1899221 (E.D.N.Y. Apr. 17, 2020); *United States* v. *Sawicz*, No. 08-CR-287 (ARR), 2020 WL 1815851 (E.D.N.Y. Apr. 10, 2020); *United States* v. *Henao*, No. 10-CR-213 (ENV), 2020 WL 1812447 (E.D.N.Y. Apr. 9, 2020); *United States* v. *Hansen*, No. 07-CR-00520 (KAM), 2020 WL 1703672 (E.D.N.Y. Apr. 8, 2020); *United States* v. *Marin*, No. 15-CR-252 (PKC), Dkt. No. 1325 (E.D.N.Y. Mar. 30, 2020).

     A.     <u>This Court May Find "Extraordinary and Compelling" Reasons for Compassionate Release Other Than Those Expressly Identified in U.S.S.G. § 1B1.13</u>

     28 U.S.C. § 994(t) authorizes the Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."  The policy statement issued in exercise of that authority lists four non-exhaustive categories of "extraordinary and compelling reasons" for sentence reduction: (1) terminal illness, (2) debilitating physical or mental health condition, (3) advanced age and deteriorating health in combination with the amount of time served, or (4) compelling family circumstances.  U.S.S.G. § 1B1.13, Application Note 1.  The commentary also includes a catchall provision for any "extraordinary and compelling reason other than, or in combination with, the reasons described," as determined by the BOP Director.  *Id.*  The sentence reduction policy statement was last amended in November 2018, before passage of the First Step

Act of 2018, which materially changed and expanded compassionate release eligibility criteria.

Since enactment of the First Step Act, courts have identified "extraordinary and compelling

reasons" in circumstances beyond the four categories listed in the Sentencing Commission's policy

statement. *See United States* v. *Haynes*, No. 93-CR-1043 (RJD), 2020 WL 1941478, at *15

(E.D.N.Y. Apr. 22, 2020) ("This Court joins [other courts] in concluding that it, too, has the

authority to grant the relief sought in this case—namely, to determine what 'Other Reasons' (as

that term is used in Application Note 1(D)) qualify as 'extraordinary and compelling' regardless

of BOP's view on the matter and without having to await a someday-updating by the

Commission of its unquestionably outdated policy statement."); *United States* v. *Copeland*, No.

02-CR-01120 (FB), 2020 WL 2537250, at *2 (E.D.N.Y. May 19, 2020) ("At bottom, the BOP's

Program Statement and Sentencing Commission's Guidelines are useful tools for defining the

'extraordinary and compelling' standard, but they are not the bounds of judicial authority to

grant compassionate release.").

     Accordingly, this Court has the authority to determine that the COVID-19

pandemic and Mr. Pedroso's chronic asthma constitute "extraordinary and compelling reasons"

to reduce Mr. Pedroso's sentence.  As explained below, this Court should exercise that authority.

    B.    <u>COVID-19 Presents an "Extraordinary and Compelling" Reason</u>
              <u>to Reduce Mr. Pedroso's Sentence</u>

     The COVID-19 pandemic presents an "extraordinary and compelling" reason for

Mr. Pedroso's compassionate release, particularly in light of his chronic asthma.  The World

Health Organization officially classified COVID-19 as a pandemic on March 11, 2020, and in

the five months since that pronouncement, COVID-19 has spread at an alarming and increasing

rate.[6]  As of August 17, 2020, more than 21.9 million people have been infected globally and 774,000 people have died.  The statistics are particularly grim in the United States where more than 5.5 million people have been infected and more than 173,000 people have died.[7]  For the week ending August 16, the United States reported 365,994 new cases and 6,887 new deaths. (*Id.*)  The CDC has warned that official statistics vastly undercount the actual spread of the disease, and that the actual number of infections is likely *ten times higher* than reported cases.[8] Such undercounting appears particularly prevalent within correctional facilities.[9]  Amid this virulent spread, all 50 states—including Maryland, where Mr. Pedroso is incarcerated—have enacted various business closures, mandatory social distancing, travel restrictions, and other mandatory preventative measures.[10]

1. *Prisons, and FCI Cumberland in particular, are vulnerable to COVID-19*

Correctional facilities like FCI Cumberland, where Mr. Pedroso is incarcerated, are particularly and uniquely vulnerable to the spread of COVID-19.  Since the outbreak started, public health experts have warned that incarcerated individuals are at "special risk of infection" and "will need special attention both to minimize transmission risk and address their healthcare

---

[6]   Ex. 20, World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[7]   Ex. 21 at 2, 24–25, Worldometer, *COVID-19 Coronavirus Pandemic*, https://www.worldometers.info/coronavirus/ (last visited Aug. 17, 2020).

[8]   Ex. 22, Allison Aubrey, *CDC: At Least 20 Million Americans Have Had Coronavirus. Here's Who's At Highest Risk*, NPR (June 25, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/06/25/883520249/cdc-at-least-20-million-americans-have-had-coronavirus-heres-who-s-at-highest-ri.

[9]   *See* Ex. 23, Brendan Saloner et al., *COVID-19 Cases and Deaths in Federal and State Prisons*, J. AM. MED. ASSOC. (July 8, 2020) ("Comprehensive data on testing rates were not available, and testing rates in both prisons and the overall population were uneven, with many facilities testing no prisoners or only symptomatic persons.  Mass testing in select prisons revealed wide COVID-19 outbreaks, with infection rates exceeding 65% in several facilities.  Reported case rates for prisoners therefore likely understated the true prevalence of COVID-19 in prisons.").

[10]   *See* Ex. 24, Jasmine Lee et al., *See How All 50 States Are Reopening (and Closing Again)*, N.Y. TIMES (Aug. 12, 2020), https://www.nytimes.com/interactive/2020/us/states-reopen-map-coronavirus.html.

needs."[11]  Members of Congress recognized these risks on March 19, 2020, when they sent a

letter to the BOP and the U.S. Department of Justice ("DOJ") calling for the release of federal

inmates who are vulnerable to COVID-19, including "persons . . . who suffer from chronic

illnesses like asthma . . . that make them vulnerable to COVID-19 infection."[12]  Similarly, on

March 27, 2020, more than 400 former federal judges, U.S. Attorneys, Assistant U.S. Attorneys,

and other officials sent an open letter to President Trump requesting immediate action to reduce

federal prison populations to prevent the catastrophic spread of COVID-19 among incarcerated

individuals by commuting sentences of medically vulnerable inmates who have served a majority

of their sentence.[13]  On that day, numerous public health experts also made a similar request and

noted that incarcerated individuals are at greater risk of contracting COVID-19.[14]  In two

separate memoranda issued to the BOP Director, Attorney General Barr similarly recognized the

extraordinary risk of federal prisoners' contracting COVID-19 and that BOP correctional

facilities had experienced "significant levels of infection" and urged the Director to prioritize

home confinement for vulnerable inmates.[15]

---

[11]   Ex. 25 at 5, Letter from 815 individuals and organizations to Vice President Mike Pence, *Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States* (Mar. 2, 2020).

[12]   Ex. 26 at 3, Letter of U.S. House of Representatives Committee on the Judiciary Chairman Jerrold Nadler and Chair Karen Bass to Attorney General William P. Barr (Mar. 19, 2020) ("DOJ and BOP must also do all they can to release as many people as possible who are currently behind bars and at risk of getting sick.  Pursuant to 18 U.S.C. § 3582(c)(1)(A), the Director of the Bureau of Prisons may move the court to reduce an inmate's term of imprisonment for 'extraordinary and compelling reasons.'").

[13]   Ex. 27, Letter from former U.S. Attorneys, federal judges, Assistant U.S. Attorneys, and DOJ Lawyers to President Donald J. Trump (Mar. 27, 2020).

[14]   Ex. 28, Letter from Public Health Experts to President Donald J. Trump (Mar. 27, 2020).

[15]   Ex. 29 at 2, Memorandum from U.S Attorney General William Barr to the Director of Bureau of Prisons, *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020); Ex. 30, Memorandum from U.S Attorney General William Barr to the Director of Bureau of Prisons, *Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020).

The pressing danger of the COVID-19 outbreak at FCI Cumberland was specifically addressed in a May 4, 2020 letter from a bipartisan group of nine U.S. Senators and Congressmen from Maryland to Attorney General Barr.  The letter described "troubling reports about conditions for prison guards, health staff, and incarcerated individuals at the medium-security FCI Cumberland," and urged the Attorney General to carry through the directives from his March 26 memorandum "directing the Bureau to prioritize the use of its statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic, particularly at-risk individuals incarcerated for nonviolent crimes."[16]

The warnings about the significant risks of federal prisoners' contracting COVID-19 reflect the overcrowding and unsanitary conditions within BOP facilities.  "Public officials have long warned that the nation's correctional facilities would most likely become vectors in the pandemic because they are often overcrowded, unsanitary places where social distancing is impractical, bathrooms and day rooms are shared by hundreds of inmates, and access to cleaning supplies is tightly controlled."[17]  Congested communal areas and overpopulated living quarters are inevitable because the BOP frequently operates many federal prisons well above their rated capacity.  FCI Cumberland is no exception: as of its last inspection report in 2017, it was occupied at 168% capacity, with health services reported as a top concern by inmates.[18]  This

---

[16]  Ex. 31 at 2, Letter from Maryland Congressional Delegation to Attorney General William P. Barr (May 4, 2020).

[17]  Ex. 32, Timothy Williams et al., *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 16, 2020), https://www.nytimes.com/2020/06/16/us/coronavirus-inmates-prisons-jails.html.

[18]  Ex. 33 at 6, District of Columbia Corrections Information Counsel, *FCI Cumberland Inspection Report* (Sept. 14, 2017).

overcrowding makes it impossible for medically vulnerable inmates like Mr. Pedroso to take preventative measures, such as social distancing, in order to prevent infection.[19]

The confluence of risk factors in prisons has produced tragic results: as of August 17, 2020, the BOP has had over 11,000 inmates under its custody test positive for COVID-19 and 113 inmate deaths.[20]  And the trajectory for new infections and deaths among inmates has starkly diverged from, and become significantly worse than, the trajectory for the United States at large.[21]  Reporting suggests that the actual number of infections and deaths among federal inmates is higher than that recorded in the official statistics.[22]

FCI Cumberland epitomizes the risk that COVID-19 poses to federal prisoners, particularly for medically vulnerable individuals like Mr. Pedroso.  Multiple sources have reported egregious violations at FCI Cumberland: one found that the prison administration

---

[19]  *See, e.g.*, Ex. 23, Brendan Saloner et al., *COVID-19 Cases and Deaths in Federal and State Prisons*, J. AM. MED. ASSOC. (July 8, 2020) ("Novel coronavirus disease 2019 (COVID-19) represents a challenge to prisons because of close confinement, limited access to personal protective equipment, and elevated burden of cardiac and respiratory conditions that exacerbate COVID-19 risk among prisoners.").

[20]  *See* Ex. 34, Federal Bureau of Prisons, *COVID-19 Coronavirus*, https://www.bop.gov/coronavirus/ (last visited Aug. 17, 2020) ("There are 1,299 federal inmates and 570 BOP staff who have confirmed positive test results for COVID-19 nationwide.  Currently, 9,920 inmates and 834 staff have recovered.  There have been 113 federal inmate deaths . . . ."); *see also* Ex. 35, Federal Defenders of N.Y., *BOP COVID-19 Charts and Graphs 8.10* (Aug. 10, 2020), https://federaldefendersny.org/assets/uploads/BOP_COVID-19_Charts_and_Graphs.8.10.pdf.

[21]  Ex. 23, Brendan Saloner et al., *COVID-19 Cases and Deaths in Federal and State Prisons*, J. AM. MED. ASSOC. (July 8, 2020) ("The COVID-19 case rate for prisoners was 5.5 times higher than the US population case rate of 587 per 100000 . . . The COVID-19 case rate was initially lower in prisons but surpassed the US population on Apr. 14, 2020.  The mean daily case growth rate was 8.3% per day in prisons and 3.4% per day in the US population.").

[22]  Ex. 36 at 4, Keri Blakinger and Keegan Hamilton, *"I Begged Them To Let Me Die": How Federal Prisons Became Coronavirus Death Traps*, THE MARSHALL PROJECT (June 18, 2020), https://www.themarshallproject.org/2020/06/18/i-begged-them-to-let-me-die-how-federal-prisons-became-coronavirus-death-traps (reporting, based on interviews with 85 federal prisoners and 25 staff members, that "Federal officials have allegedly tried to conceal the extent of the outbreak by limiting testing—so that they didn't have to report positive cases—and refusing to recognize one staff death. As of Tuesday [June 16], they had completed testing on less than 13 percent of prisoners in BOP-run facilities.").

13

"makes jokes about" COVID-19;[23] another found that, as of April, workers in a prison-run license plate factory were still required to go to the facility despite someone within the factory's testing positive for the disease.[24]

Several courts have specifically described the dangerous conditions at FCI Cumberland in granting compassionate release motions for inmates formerly housed at the facility. *See, e.g.*, *United States* v. *Gutman*, No. 19-CR-0069 (RDB), 2020 WL 2467435, at *2 (D. Md. May 13, 2020) ("COVID-19 has spread to FCI Cumberland, where Gutman is incarcerated."); *United States* v. *Canini*, No. 4-CR-283, Dkt. No. 337 at 4 n.3 (S.D.N.Y. June 8, 2020) ("FCI Cumberland has had positive COVID-19 cases among inmates and staff.").

COVID-19 has also spread throughout Allegany County, where FCI Cumberland is located.[25]  On a daily basis, people come and go from FCI Cumberland, which significantly expands the transmission vector and increases the incarcerated population's risk of contracting the disease.[26]

Mr. Pedroso is powerless at FCI Cumberland to take appropriate preventative self-care measures.  He cannot self-quarantine or practice social distancing given that the facility

---

[23]   *See* Ex. 37, Seth Ferranti, *'The Warden Doesn't Care': How Inmates Are Preparing for the Coronavirus,* VICE NEWS (Mar. 13, 2020), https://www.vice.com/en_us/article/z3b888/the-warden-doesnt-care-how-inmates-are-preparing-for-the-coronavirus.

[24]   Ex. 38, Cary Aspinwall et al., *Federal Prison Factories Kept Running as Coronavirus Spread*, THE MARSHALL PROJECT (Apr. 10, 2020), https://www.themarshallproject.org/2020/04/10/federal-prison-factories-kept-running-as-coronavirus-spread.

[25]   Ex. 39, Press Release, Allegany County, Maryland Coronavirus Joint Information Center, *Allegany County COVID-19 Cases Rise to 337* (Aug. 16, 2020) (noting 337 positive COVID-19 cases in Allegany County as of August 14, 2020, with 19 new cases in two days including one inmate at FCI Cumberland).

[26]   Ex. 31 at 2, Letter from Maryland Congressional Delegation to Attorney General William P. Barr (May 4, 2020) (noting "troubling reports" from FCI Cumberland that "highlight staff shortages; inadequate personal protective equipment (PPE) and medical services for guard, staff, and incarcerated individuals; and a failure to follow Centers for Disease Control (CDC) guidelines for containing the virus. Further, press reports indicate that incarcerated individuals working in a Unicor factory at this facility had to continue making license plates even after several factory workers tested positive for the virus, in order to avoid interruptions to shipments.").

is operating far above its rated capacity. (M. Trainor Decl. ¶ 4 (noting that "When James is let out of his cell, he cannot socially distance because telephones and computer stations are in shared spaces. James told me that he has put a sock over the telephone to try to limit his exposure to other inmates.").) Nor can Mr. Pedroso voluntarily isolate in his own cell. Mr. Pedroso shares a narrow 12 by 7.5 foot cell—with poor ventilation and no windows—with another inmate, and they sleep in bunkbeds, which positions Mr. Pedroso just a few feet from his cellmate. (J. Pedroso Ltr. ¶ 6.) Mr. Pedroso's risk profile is further elevated by the fact that he works as a caretaker for his immunocompromised elderly cellmate, who has a host of underlying medical conditions and who requires Mr. Pedroso to change his colostomy bag several times a day. Mr. Pedroso is further exposed to numerous sick individuals as a result of his cellmate's frequent visits to the sick ward to receive medical attention.

2.     *Mr. Pedroso's Chronic Asthma Is a Grave Risk Factor for COVID-19*

Mr. Pedroso's severe medical condition puts him at high risk of serious illness or death if he contracts COVID-19. Both the CDC and Harvard Medical School have issued guidance that people with moderate to severe asthma might face an increased risk of severe illness from COVID-19.[27] Medical experts have reported that individuals who frequently need to use a rescue inhaler, like Mr. Pedroso, likely have "uncontrolled" asthma, which makes them particularly vulnerable to COVID-19.[28]

---

[27]  Ex. 10, CDC, *People With Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (Aug. 14, 2020); Ex. 40, Harvard Health Publishing, Harvard Medical School, *If you are at higher ris*k, https://www.health.harvard.edu/diseases-and-conditions/if-you-are-at-higher-risk (July 2, 2020).

[28]  Ex. 41, ABC 7 Chicago Digital Team, *Asthma medications, like inhalers, in short supply during COVID-19 pandemic, Chicago specialist says* (Apr. 25, 2020), https://abc7chicago.com/asthma-coronavirus-inhaler-shortage-drug-covid/6129173/ (Dr. John Latall from Premier Allergy, Asthma and Sinus Care stating that, "If a patient is having asthma symptoms or needing to use an albuterol or other rescue inhaler at least twice per week, they likely have uncontrolled asthma. Since such patients are at high risk of COVID-19 complications, they should promptly be seen in-person at their allergist or pulmonologist's office to do breathing tests that can fine-tune appropriate treatment."); Ex. 42, Leslie Young, *Asthma and coronavirus — what are the risks?*, Global

The high risk profile of asthma is evidenced by its overwhelming prevalence among hospitalized patients with COVID-19.  For example, on April 30, the CDC released a report that found that "Asthma was documented in 10.5% of all [COVID-19] patients," and 13.5% of the patients in the age range of 18 to 49 had been diagnosed with asthma—the highest prevalence rate of any age group.  In the study, asthma was third to only diabetes and obesity as the most prevalent "high-risk condition" in that age range.[29]  Similarly, the CDC released a report on April 17 indicating that 27.3% of hospitalized COVID-19 patients in the 18 to 49-year-old age range had asthma, with asthma second to obesity as the most prevalent high-risk condition among 14 different underlying medical conditions.[30]  An earlier CDC study similarly found that 20.6% of COVID-19 patients admitted to an intensive care unit ("ICU") and 14.7% of non-ICU COVID-19 hospitalized patients had a chronic lung disease, including asthma, chronic obstructive pulmonary disease, and emphysema.[31]  As of July 18, CDC surveillance of laboratory-confirmed COVID-19 hospitalizations indicated that 11.5% of patients suffered from asthma compared to 7.7% in the general population, which indicates a 1.5x rate of prevalence.[32]  A study of critically ill patients who tested positive for COVID-19 in the Seattle region found

---

News, https://globalnews.ca/news/6858267/asthma-coronavirus-risk/ (May 11, 2020) ([Dr. Shawn Aaron, a respirologist at the Ottawa Hospital and spokesperson for the Canadian Lung Association, stating that, "If their asthma is not well-controlled and let's say their lung function is only 70 per cent of what it should be, they're going to be much more vulnerable if they get a COVID infection to get really sick.").

[29]   Ex. 43 at 5, Jeremy A. W. Gold et al., *Characteristics and Clinical Outcomes of Adult Patients Hospitalized with COVID-19 — Georgia, March 2020*, Morbidity and Mortality Weekly Report, CDC (Apr. 29, 2020).

[30]   Ex. 44 at 3, Shikha Garg et al., *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 — COVID-NET, 14 States, March 1–30, 2020*, Morbidity and Mortality Weekly Report, CDC (Apr. 17, 2020).

[31]   Ex. 45 at 4, CDC COVID-19 Response Team, *Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February12–March 28, 2020*, Morbidity and Mortality Weekly Report, CDC (Apr. 3, 2020).

[32]   *See* Ex. 11 at 14, CDC, *Coronavirus Disease 2019, Key Updates for Week 31, ending August 1, 2020*, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html  (Aug. 14, 2020); Ex. 12, CDC, *National Center for Health Statistics – Asthma*, https://www.cdc.gov/nchs/fastats/asthma.htm (Feb. 21, 2020).

that 14% of patients admitted to ICUs had been treated for suspected asthma exacerbation in the week before their admission to the ICU for COVID-19.[33]

Several courts have found that asthma presents a potentially lethal risk factor for COVID-19 that warrants compassionate release. *See, e.g.*, *United States* v. *Henao*, No. 10-CR-213 (ENV), 2020 WL 1812447, at *1 (E.D.N.Y. Apr. 9, 2020) (granting compassionate release for inmate with chronic lung disease and trouble breathing); *United States* v. *Hernandez*, No. 18-CR-834-04 (PAE), 2020 WL 1684062, at *3 (S.D.N.Y. Apr. 2, 2020) (finding 23-year-old inmate's asthma was extraordinary and compelling reason warranting release, and acknowledging that COVID-19 "presents a heightened risk for incarcerated defendants like Mr. Hernandez with respiratory ailments such as asthma" and that "a high-risk inmate who contracts the virus while in prison will face challenges in caring for himself."); *United States* v. *Smith*, No. 12-CR-133 (JFK), 2020 WL 1849748, at *4 (S.D.N.Y. Apr. 13, 2020) (defendant's asthma placed him "at a higher risk for developing serious complications should he be exposed to COVID-19"); *United States* v. *Canini*, No. 4-CR-283, Dkt. No. 337 at 4 (S.D.N.Y. June 8, 2020) (same); *United States* v. *Harris*, No. 18-CR-364, Dkt No. 414 at 3–4 (S.D.N.Y. Apr. 8, 2020) (same); *United States* v. *Park*, No. 16-CR-473 (RA), 2020 WL 1970603, at *3 (S.D.N.Y. Apr. 24, 2020) (same).

Mr. Pedroso has had chronic asthma since he was eight years old.  (Presentence Report ("PSR") at 14  (noting that "the defendant was diagnosed with asthma when he was eight years old.  He continues to use an albuterol pump for the condition."); Pedroso Ltr. ¶ 3; L. and J. Pedroso Sr. Joint Decl. ¶ 2; C. Pedroso Decl. ¶ 2.)  Mr. Pedroso has required a battery of

---

[33]  Ex. 46 at 4, Pavan K. Bhatraju et al., *Covid-19 in Critically Ill Patients in the Seattle Region — Case Series*, 382 NEW ENGLAND J. OF MED. 21 (Mar. 30, 2020).

different medications and treatments to control his asthma attacks, including medications like Singulair, Advair, Albuterol, Qvar, Medrol, and Flovent, and devices like nebulizers and inhalers.  (J. Pedroso Ltr. ¶ 4; *see* Ex. 8 at 3, 6, 11, 13, 19 (prescriptions from Mr. Pedroso's private treating physician to treat Mr. Pedroso's chronic obstructive asthma).)  On numerous occasions, Mr. Pedroso's asthma has become life-threatening, requiring urgent hospitalization and intubation.  (J. Pedroso Ltr. ¶¶ 3–4.)  Approximately five years ago, Mr. Pedroso suffered an asthma attack that was so severe that responding paramedics informed his family that Mr. Pedroso would have died if they had arrived 20 minutes later.  (C. Pedroso Decl. ¶ 3.)

Mr. Pedroso's chronic asthma has persisted unabated at FCI Cumberland.  He suffers uncontrolled asthma attacks twice a week or more, including as recently as August 19, 2020.  (J. Pedroso Ltr. ¶ 5.)  In the last 18 months, Mr. Pedroso has required clinical medical attention related to his asthma on five occasions, with doctors reporting shortness of breath, wheezing, and chest tightness, and prescribing numerous albuterol inhalers.  (*See* Ex. 9 at 4–8, 36–41, 46–46.)

Incarceration makes it impossible for Mr. Pedroso to follow the COVID-19 health guidance for asthmatics.  In addition to social-distancing measures, asthmatics are encouraged to keep their asthma under control, minimize exposure to anything that might trigger an asthma attack, and monitor their asthma daily through the use of a peak flow meter to monitor how well their airways are staying open.[34]  Mr. Pedroso cannot abide by these guidelines.

---

[34] Ex. 47, AAFA Community Services, *Coronavirus (COVID-19): What People With Asthma Need to Know*, Asthma and Allergy Foundation of America, https://community.aafa.org/blog/coronavirus-2019-ncov-flu-what-people-with-asthma-need-to-know (July 16, 2020).

For these reasons, this Court should join others in determining that Mr. Pedroso's chronic asthma and inability to control his respiratory illness constitute "extraordinary and compelling reasons" to grant Mr. Pedroso's request for compassionate release.

C.     Numerous Courts in This District and Elsewhere Have Granted Compassionate Release for Medically Vulnerable Inmates at High Risk for COVID-19, Including Numerous Inmates at FCI Cumberland

Since the outbreak of this pandemic, courts in this District have repeatedly heeded the call from legal and medical experts, Congress, and the Attorney General, to grant compassionate release to medically vulnerable inmates in overcrowded federal facilities because of their heightened risk of life-threatening complications from COVID-19.  *See, e.g.*, *United States* v. *Kissi*, No. 13-CR-51 (MKB), 2020 WL 3723055, at \*14 (E.D.N.Y. June 26, 2020) ("In addition to the unprecedented health risks the COVID-19 pandemic presents to incarcerated individuals, including individuals who, like Kissi, may be at elevated risk for complications should they contract the virus, the pandemic has also altered the conditions of confinement in significant ways."); *United States* v. *Mapp*, No. 95-CR-01162 (FB), 2020 WL 3410344, at \*2 (E.D.N.Y. June 19, 2020) ("Mapp's medical conditions, coupled with the emergence and rapid spread of COVID-19 at federal correctional facilities like FCI Otisville 'substantially diminish[ ]' his ability to 'provide self-care within the environment of a correctional facility.'"); *United States* v. *Copeland*, No. 2-CR-01120 (FB), 2020 WL 2537250, at \*1 (E.D.N.Y. May 19, 2020) ("Here, Copeland's age and host of underlying medical conditions, coupled with the emergence and rapid spread of COVID-19 at FCI Fort Dix (and federal correctional facilities generally), 'substantially diminish [ ]' his ability to 'provide self-care within the environment of a correctional facility.'"); *United States* v. *Sedge*, No. 16-CR-537 (KAM), 2020 WL 2475071, at \*3 (E.D.N.Y. May 13, 2020) ("Defendant has demonstrated that he has current medical conditions that place him at an increased risk for developing serious, potentially life-threatening

complications from the [COVID-19] virus."); *United States* v. *Moskowitz*, No. 11-CR-793

(WFK), Dkt. No. 203 (E.D.N.Y. Apr. 30, 2020); *United States* v. *Asaro*, No. 17-CR-127 (ARR),

2020 WL 1899221, at *6 (E.D.N.Y. Apr. 17, 2020) ("In addition, the combination of the

COVID-19 health crisis and Asaro's age and pre-existing conditions constitutes an extraordinary

and compelling reason for his release."); *United States* v. *Sawicz*, No. 8-CR-287 (ARR), 2020

WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020) (finding that the "COVID-19 pandemic, combined

with [Defendant's] particular vulnerability to complications from COVID-19 because of his

hypertension, constitutes an 'extraordinary and compelling reason' for his release."); *United

States* v. *Henao*, No. 10-CR-213 (ENV), 2020 WL 1812447, at *1 (E.D.N.Y. Apr. 9, 2020)

("The Court grants defendant['s] motion . . . for compassionate release, pursuant to 18 U.S.C.

§ 3582(c)(1)(A), for the reasons stated in his motion, including his health issues, elevated risk of

dire health consequences due to the current COVID-19 outbreak, and status as a non-violent

offender."); *United States* v. *Hansen*, No. 7-CR-00520 (KAM), 2020 WL 1703672, at *9

(E.D.N.Y. Apr. 8, 2020) ("Mr. Hansen's medical risk from the COVID-19 pandemic, taken

alone, arguably constitutes 'extraordinary and compelling' circumstances justifying his

release."); *United States* v. *Marin*, No. 15-CR-252 (PKC), Dkt. No. 1325 (E.D.N.Y. Mar. 30,

2020).

Many courts have also granted compassionate release to inmates at FCI

Cumberland because of the high risk of contracting this highly transmissible and extraordinarily

dangerous disease.  *See, e.g.*, *United States* v. *Gutman*, No. 19-CR-0069 (RDB), 2020 WL

2467435, at *2 (D. Md. May 13, 2020) (granting compassionate release in part because

"COVID-19 has spread to FCI Cumberland, where Gutman is incarcerated"); *United States* v.

*Canini*, No. 4-CR-283, Dkt. No. 337 (S.D.N.Y. June 8, 2020); *United States* v. *Chappell*, No. 10-

CR-6085 (JWF), Dkt. No. 79 (W.D.N.Y. June 19, 2020); *United States* v. *Gakhal*, No. 15-CR-470 (JHL), 2020 WL 3529904 (N.D. Ill. June 30, 2020).  Mr. Pedroso's compassionate release motion closely resembles the successful motion in *Canini*: both defendants were incarcerated at FCI Cumberland; both were convicted of non-violent drug offenses and had served most of their terms; both are relatively young and within the 18 to 49-year-old age bracket; and both have suffered from chronic asthma throughout their lives and incarceration.  *See Canini*, No. 4-CR-283 (PAC), Dkt. No 337 at 4–6 (granting compassionate release because "Canini's medical condition—moderate to severe chronic asthma, and documented history of respiratory issues places him at high-risk of serious illness or death should he be exposed to the novel severe acute respiratory illness.").  Similarly, in *Chappell*, the court granted compassionate release for an inmate at FCI Cumberland because the defendant suffered from "severe" pre-existing medical conditions—including asthma and "significant lung issues"—that are "specifically referenced by the CDC making one more vulnerable to contract the virus, and if infected, suffer severe consequences."  *See Chappell*, No. 10-CR-6085 (JWF), Dkt. No. 79 at 2, 4.

### III.    The 18 U.S.C. § 3553(A) Sentencing Factors Warrant Reducing Mr. Pedroso's Sentence to Time Served or Modifying His Judgment to Allow Serving the Remainder of His Sentence on Home Confinement

The compassionate release statute requires courts to "consider[] the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable" to a motion for sentence reduction.  18 U.S.C. § 3582(c)(1)(A).  In considering these factors, courts must consider post-offense developments.  *Pepper* v. *United States*, 562 U.S. 476, 490–93 (2011).  Here, the applicable sentencing factors favor reducing Mr. Pedroso's sentence because Mr. Pedroso (i) is a non-violent offender who is not a danger to the community, (ii) has already served the vast majority of his sentence, (iii) has been a model inmate, and (iv) has a robust release plan that

ensures a safe transition to the community where he can follow professional guidelines to protect himself adequately from contracting COVID-19.

*First*, Mr. Pedroso's offense, while concededly serious, did not involve violence or weapons.  Mr. Pedroso was convicted of one count of possession with intent to distribute a controlled substance and sentenced to 48 months in prison.  Although Mr. Pedroso has been convicted of drug offenses before, he has never been convicted of any violent or weapons-based offense.  (*See* PSR at 7–12.)

*Second*, Mr. Pedroso has already served the majority of his federal sentence, which was imposed in January 2018.[35]  The BOP calculates that his release date, with good time credit, is June 6, 2021, and he is scheduled for release to a halfway house on December 9, 2020.  (*See* Ex. 1.)  If the Court were to release Mr. Pedroso in September, it would be <u>only three months earlier</u> than his scheduled release from FCI Cumberland to a halfway house.  *See United States* v. *Sawicz*, No. 8-CR-287 (ARR), 2020 WL 1815851, at *3 (E.D.N.Y. Apr. 10, 2020) ("Further militating in favor of the defendant's release is the fact that the defendant is less than five months away from the date on which he would be eligible for release to home confinement under normal circumstances.").

Any risk from this small reduction in sentence is outweighed by the danger to Mr. Pedroso of remaining incarcerated with his severe medical condition during the COVID-19 pandemic.  *See supra* at 9–18.  In these circumstances, reducing Mr. Pedroso's sentence to time served, or allowing him to serve the remainder of his sentence in home confinement, is "sufficient, but not greater than necessary" to serve the purposes of sentencing under § 3553(a).

---

[35]   Mr. Pedroso also served an additional 11 months on a related state sentence before his federal sentence was imposed.  PSR at ¶ 7; Sentencing Memorandum from United States, Dkt. No. 31 at 4.

*See, e.g.*, *United States* v. *Henao*, No. 10-CR-213 (ENV), 2020 WL 1812447, at *1 (E.D.N.Y. Apr. 9, 2020) (granting home confinement for asthmatic inmate at "elevated risk of dire health consequences due to the current COVID-19 outbreak"); *United States* v. *Canini*, No. 4-CR-283, Dkt. No. 337 at 6 (S.D.N.Y. June 8, 2020) (asthmatic defendant incarcerated at FCI Cumberland "like other high-risk defendants, has demonstrated 'extraordinary and compelling' reasons for release.").

  *Third*, Mr. Pedroso has taken advantage of several opportunities to grow and rehabilitate during his incarceration, and has been an exemplary inmate.  Mr. Pedroso has renewed his focus on education, earning his General Equivalency Degree in 2018.  (*See* Ex. 13.) He also received certifications in December 2019 for completing a 120-hour two-part course on drywall installation and finishing from the Allegany College of Maryland's Center for Continuing Education and Workforce Development.  (*See* Ex. 14.)  For the last nine months, Mr. Pedroso has worked as a health aide for his 83-year-old cellmate and learned numerous skills related to professional caregiving.  (J. Pedroso Ltr. ¶ 9.)  As described above, Mr. Pedroso has stayed sober during his incarceration, and dedicated himself to self-improvement through attending Narcotics Anonymous sessions, meditating, and reading self-help books.  (J. Pedroso Ltr. ¶¶ 8, 10.)

  Mr. Pedroso has also committed to improving himself during his incarceration and has taken proactive steps to ensure he does not recidivate.  For the first time in his life, Mr. Pedroso has acknowledged his serious drug addiction.  (J. Pedroso Ltr. ¶ 8; L. and J. Pedroso Sr. Joint Decl. ¶¶ 8–9; M. Trainor Decl. ¶ 10; C. Pedroso Decl. ¶ 7.)  Mr. Pedroso voluntarily attended a drug program at the Metropolitan Correctional Center. He has also attended Narcotics Anonymous sessions three times a week at FCI Cumberland until the sessions were shut down as

a result of the pandemic.  (J. Pedroso Ltr. ¶ 8.)  Mr. Pedroso has become sober during his current incarceration, and is committed to maintaining his sobriety upon release, including by regularly attending drug treatment classes.  Mr. Pedroso has also begun meditating during his incarceration and has read several self-improvement books including *Resilience: Hardwon Hard-Won Wisdom for Living a Better Life* and *Unbeatable Mind: Forge Resiliency and Mental Toughness to Succeed at an Elite Level.*  (J. Pedroso Ltr. ¶ 10.)  Mr. Pedroso's family has witnessed a dramatic change in his behavior and mindset during his current period of incarceration; Mr. Pedroso's parents believe he is "finally owning up to his problems and mistakes" and "is truly ready for change," and Mr. Pedroso's sister feels that "for the first time in many years" she has "her best friend back."  (L. and J. Pedroso Sr. Joint Decl. ¶ 8; C. Pedroso Decl. ¶ 7.)

*Fourth*, during his current term of incarceration, Mr. Pedroso has had only one disciplinary infraction, from early 2017 before he began serving his federal sentence.  (*See* Ex. 48.)  Other courts have granted compassionate release motions for inmates with little disciplinary history who similarly availed themselves of opportunities for growth and betterment while incarcerated.  *See, e.g.*, *United States* v. *Canini*, No. 4-CR-283, Dkt. No. 337 at 6 (S.D.N.Y. June 8, 2020) (granting compassionate release because defendant "has taken steps to rehabilitate himself; he earned his GED and successfully completed several programs including anger management programs, phase one and two of rational thinking, Turning Point Modules for gambling, coping, and a drug education class.  Canini also presents a thoughtful release plan that provides a stable living situation with his partner and family.").

The non-violent nature of Mr. Pedroso's drug offense, coupled with his strong commitment to sobriety and self-improvement during incarceration and on release, shows that he is not a threat to the community and counsel in favor of granting his motion for compassionate

release.  *See, e.g.*, *United States* v. *Hansen*, No. 7-CR-00520 (KAM), 2020 WL 1703672, at *9

(E.D.N.Y. Apr. 8, 2020) ("The court is persuaded that Mr. Hansen does not pose a safety risk . . .

The instant conviction was not a crime of violence . . . . During his time in custody, Mr. Hansen

has been a model inmate, and the sole blemish on his behavioral record is a 2013 infraction for

phone abuse."); *United States* v. *Kissi*, No. 13-CR-51 (MKB), 2020 WL 3723055, at *1

(E.D.N.Y. June 26, 2020) (granting compassionate release in part because defendant was

"convicted of a nonviolent drug offense").

   *Finally*, Mr. Pedroso has thoughtfully developed a release plan, in collaboration

with Ms. Trainor and his family, that ensures he has a safe place to quarantine and a stable living

situation that minimizes the risk of recidivism.  On release, Mr. Pedroso intends to live with Ms.

Trainor in her Upper East Side apartment, where he will have a fresh start in a new

neighborhood.  Mr. Pedroso and Ms. Trainor will live together with no other individuals,

allowing Mr. Pedroso to take appropriate self-quarantine measures to protect himself from

COVID-19.  The apartment is located near a public transportation hub that will allow Mr.

Pedroso to commute to his construction jobs and visit his family in Queens after any quarantine

period that the Court may impose.  Ms. Trainor can provide financial support to Mr. Pedroso,

and is particularly well qualified to assist with his transition to civilian life based on her work as

a social worker for The Legal Aid Society and a reentry social worker on Rikers Island.  (*See* M.

Trainor Decl.)  Ms. Trainor has already contacted the Community Reentry and Assistance

Network from the *Empower Assist Care* foundation, which issued a letter indicating that it will

assist Mr. Pedroso with reentry services, including "acquiring his medications, obtaining a

shelter referral, mental health, medical and substance abuse referrals, educational/ vocational,

and entitlements assistance."  (Ex. 16.)

Mr. Pedroso will also have the full support of his family on his release.  (*See* L. and J. Pedroso Sr. Joint Decl. ¶ 16; M. Trainor Decl. ¶¶ 11–13; C. Pedroso Decl. ¶ 10; *see also* Letter from James Pedroso's niece, Cassie Ortiz, attached as Ex. 49.)  He has stayed in close contact with his mother, father, and sister during his incarceration, and all three have submitted declarations in support of Mr. Pedroso's motion, indicating that they will provide him with emotional and financial support, as well as housing should it be needed.  (*See* L. and J. Pedroso Sr. Joint Decl. ¶ 16; M. Trainor Decl. ¶¶ 11–13; C. Pedroso Decl. ¶ 10.)

Mr. Pedroso also has a firm offer of employment on his release from the concrete contracting company, Prime Ready Mix.  (Ex. 17.)  Mr. Pedroso is well qualified to work in the concrete business based on his extensive experience in construction and contracting.  Mr. Pedroso's sensible release plan, including a safe home, supportive environment, and firm employment offer, strongly supports granting his motion for compassionate release.

## **CONCLUSION**

Mr. Pedroso respectfully requests that the Court reduce his sentence to time served and order his immediate release from FCI Cumberland, or, in the alternative, modify his sentence to permit the remainder to be served in home confinement.

Respectfully submitted,

Dated: August 20, 2020
New York, New York

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

/s/      *Justin D. Lerer*
Justin D. Lerer
Daniel S. Sinnreich
Daniel A. Negless
Alexander F. Atkins
1285 Avenue of the Americas
New York, NY  10019
Telephone: (212) 373-3766
Fax: (212) 492-0766

*Counsel for Defendant James Pedroso*

27